Filed 9/26/14  P. v. Edwards CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B245782 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. KA090257) |
| LEBARRON JAMES EDWARDS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Douglas Sortino, Judge.  Affirmed.

Law Offices of John P. Dwyer and John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Robert C. Schneider, Deputy Attorney General, for Plaintiff and Respondent.

* * * * * *

Appellant Lebarron James Edwards and an accomplice robbed a number of Check 'N Go stores in Los Angeles County over a six-week period in 2010. A jury convicted appellant of eight counts of second degree robbery (Pen. Code, § 211, counts 1, 7, 9, 13, 15, 18, 25, and 27),[1] seven counts of kidnapping for robbery (§ 209, subd. (b)(1), counts 2, 6, 8, 12, 14, 24, and 26), and three counts of possession of a firearm by a felon (§ 12021, subd. (a)(1), counts 11, 20, and 29). The jury also found true firearm allegations under sections 12022.53, subdivision (b) and 12022, subdivision (a)(1). In a separate proceeding, the trial court found that appellant suffered eight prior strike convictions and served three separate prison terms (§§ 667, subds. (a)(1) and (b); 1170.12, subds. (a)-(d); and 667.5, subd. (b)). The trial court sentenced appellant to a prison term of 422 years to life. The trial court stayed a combined sentence of 357 years to life under section 654, and ordered appellant to serve a concurrent term of 75 years to life for being a felon in possession of a firearm. The trial court awarded appellant 1,992 days of presentence custody credit.

Appellant contends (1) he was denied his constitutional right to represent himself, (2) the evidence was insufficient to sustain the kidnapping for robbery convictions, and (3) he received ineffective assistance of counsel.

We affirm.

## FACTS

*Prosecution Case*

### 1. Check 'N Go Store–Hawaiian Gardens–Counts 18, 20

On March 1, 2010, at approximately 1:05 p.m., Tammy Scott the manager of the Hawaiian Gardens Check 'N Go saw appellant and Michael Utley get out of a black SUV and approach the front door of the store. The two men entered the store and appellant grabbed Scott and threw her to the ground. Both men had guns and Scott heard appellant tell Utley to go into the back room and if anyone was there to "shoot them." Appellant

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

took approximately $3,500 in cash from the cash drawers. Appellant told Scott to lay on the ground and count to 1,000 before she got up.

Scott positively identified appellant in a photographic lineup and in court.

### 2. Check 'N Go Store–Sun Valley–Counts 12-15

On March 22, 2010, at approximately 1:50 p.m., Veronica Pineda and Brina Okamato were working at the Sun Valley Check 'N Go when appellant and Utley entered the store. One of the men took out a gun and said "Get on the ground. It's a robbery." Appellant took cash from a cash drawer and ordered Pineda and Okamoto to go to the bathroom at the rear of the store. Utley searched the purses of Pineda and Okamoto and took their cell phones and identification. Appellant was unable to open the second drawer and Okamoto was brought out of the bathroom and told to open the cash drawer. Pineda was told to step out of the bathroom and lie on the ground. After Okamato opened the cash drawer at the front of the store, she and Pineda were ordered back into the bathroom. They were told to "count to 500" and not to come out.

Pineda identified appellant and Utley from photographic lineups and at the preliminary hearing. She identified appellant in court during trial.

### 3. Check 'N Go Store–La Puente–Counts 24-27, and 29

On March 29, 2010, Ruben Martinez and Jessica Inostros were working at the La Puente Check 'N Go. At approximately 4:00 p.m. appellant and Utley entered the store. Appellant pointed a gun at Martinez and Inostros and ordered them to lie on the floor. Appellant and Utley took the money from the cash drawers. They ordered Martinez and Inostros to go to the back of the store and locked them in the bathroom. Martinez identified Utley in a photographic lineup and at the preliminary hearing. Appellant looked familiar to him but he could not positively identify him at trial. Inostros viewed the security video of the robbery. The video showed appellant entering the store and pointing a gun at Inostros. Inostros identified appellant from photos taken from the video and she also identified appellant in court. The photos taken from the video show the

3

person Inostros identified as appellant pointing a gun at her. Inostros's husband was in the military. She had gone shooting with him and knew "a little bit about guns."

### 4. Check 'N Go Store–Covina–Counts 6-9, and 11

On April 1, 2010, Jason Cheng and Alma Sandoval were working at the Covina Check 'N Go. At approximately 1:35 p.m. Sandoval saw appellant and Utley enter the store. Appellant pointed a handgun at Sandoval and told her to be quiet. The gun was small and black and looked like a nine-millimeter automatic pistol. Sandoval and Cheng were told to kneel down behind a store partition. Cheng gave appellant and Utley the store surveillance tape and then he and Sandoval were ordered to the back of the store. Appellant and Utley took Cheng's cell phone and wallet and approximately $2,000 from the cash drawers. Appellant ordered Cheng and Sandoval into the bathroom. Cheng and Sandoval were told "to count" and not to come out of the bathroom for a couple of minutes.

Sandoval identified appellant from a photographic lineup. She could not identify Utley from photos or at the preliminary hearing but was sure of her in-court identification of appellant at trial. Cheng identified Utley in a photographic lineup.

### 5. Check 'N Go Store–Pomona–Counts 1 and 2

On April 5, 2010, Eva Gonzalez was the manager of the Pomona Check 'N Go. Shortly before noon, appellant walked into the store armed with a handgun. Appellant pointed the gun at Gonzalez and ordered her to get under the counter. Utley then entered the store and he also had a gun. After taking the money from the cash drawers, appellant ordered Gonzalez to open the safe. The safe operated on a 10-minute time delay and appellant and Utley took approximately $2,000 from the safe when it was opened. Gonzalez was taken to the back of the store and handcuffed to her desk.

Security video of the robbery showed appellant with a gun in his right hand entering the store and jumping over the counter. Appellant was not wearing gloves and he had a piece of paper in his hand when he jumped over the counter. Gonzalez

4

identified appellant from the security video and from a photographic lineup, and also positively identified appellant in court.

### 6. Investigation

On April 5, 2010, Pomona Police Officer Steve Prentice recovered a two-page printout of Check 'N Go locations from the counter of the Pomona store. The printout did not belong to the Check 'N Go store. The addresses of some stores were crossed out and the address of the Pomona store was circled. Forensic testing showed appellant's fingerprints on the printout.

On April 8, 2010, at approximately 2:45 p.m. Maria Razo was in her car outside the Northridge Check 'N Go. Razo was waiting for her shift to begin at 3:00 p.m. when she saw two men acting suspiciously approach the store. Razo called her manager and told her not to unlock the store doors. The men walked to an alley and drove off in a black Chevy Tahoe. Razo gave the license plate number to her manager and the incident was reported to the police.

Alhambra Police Officer Wilfredo Ruiz was part of a task force investigating the Check 'N Go robberies. Officer Ruiz was aware of appellant and Utley, and a possible link to a black Chevy Tahoe SUV. On April 9, 2010, Officer Ruiz and his team stopped Utley while he was driving a black Chevy Tahoe SUV and detained him. Pomona Police Officer Ruben Castillo searched the Chevy Tahoe and recovered a four-page printout of an internet search for Check 'N Go locations. He also recovered two sets of handcuff keys from the vehicle.

Los Angeles County Deputy Sheriff Antoinette Bowen testified that on June 8, 2009, she stopped a car driven by appellant for a traffic violation. Utley was a passenger in the car.

*Defense Case*

Appellant presented a defense of mistaken identity. Ida Edwards, appellant's mother, testified that appellant visited her when she was in hospital on certain dates. Ms. Edwards admitted her memory was not good because of the medications she took.

5

**DISCUSSION**

**I.      Appellant's Pretrial Request to Represent Himself Was Properly Denied**

Appellant contends his convictions must be reversed because the trial court erroneously denied his pretrial right to represent himself, in violation of *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

Appellant appeared with counsel on March 22, 2011, the day that trial was set to begin. The trial court was about to grant a continuance at defense counsel's request when appellant asked to address the court. Appellant stated "I would like to go on record and exercise my *Faretta* rights at this time." The court obtained appellant's time waiver and granted the continuance to April 27, 2011. After appellant completed the *Faretta* waiver forms he expressed a misunderstanding of his counsel's actions. The court asked if he wanted to retain new counsel rather than represent himself and appellant responded, "Yes sir." At the subsequent *Marsden* hearing,[2] appellant advised the court that he was suffering from some health issues involving his nerves and his teeth. Appellant felt his counsel was "not really giving" him "100 percent" and was not conducting an adequate investigation. Counsel explained to the court that he had investigated appellant's case including appellant's claimed alibis for the robberies. Counsel understood the prosecution theory was that the same two men committed all of the robberies and counsel's strategy was to create doubt as to two or three of them thereby creating doubt as to all of them. Counsel stated he did not think appellant's request for a fingerprint expert would be helpful. Appellant discussed alibis for dates unrelated to any of the robberies which were irrelevant to any defense. He described his situation as "heavy" and stated "I just would like to be basically vindicated from this because I'm a man." The trial court denied appellant's *Marsden* motion, explaining that appellant had failed to reach the burden required for the court to appoint new counsel. The court then turned to

---

[2]      *People v. Marsden* (1970) 2 Cal.3d 118.

the unresolved *Faretta* issue and asked appellant if he wanted to continue with counsel or represent himself at trial on April 27, 2011. Appellant chose to continue with counsel.

On April 27, 2011, court convened with stand-in counsel for appellant. Appellant's appointed counsel was in trial but expected to be available by May 4, 2011, and the court trailed the case to that date. During the hearing, appellant stated he wanted to file a *Faretta* motion. The court informed appellant that he would have to be ready for trial on May 4, 2011, and that no continuances would be permitted. Appellant asked about filing "certain motions and whatnot" and the court told appellant if he filed them they would be heard on May 4, 2011. Appellant responded, "That's cool." When the court asked if appellant was certain he wanted to make the prosecutor's job easier to gain a conviction, appellant responded, "Well, it really don't matter."

Appellant completed the *Faretta* waiver form and the court questioned him about his understanding of self-representation. The court told appellant he had the right to represent himself but he would have to be prepared to proceed on May 4, 2011, the date set for trial. Appellant stated he needed a continuance to file motions. The court stated there would be no further continuances. When appellant asked why he was not granted a continuance, the court stated that trial was set for May 4, 2011, and appellant needed to have everything completed by that date. The court denied appellant's request to represent himself because appellant could not be ready to proceed to trial in a timely manner.

A defendant's request for self-representation must be knowing, voluntary, and unequivocal (*Faretta, supra,* 422 U.S. at pp. 835-836; *People v. Barnett* (1998) 17 Cal.4th 1044, 1087) and asserted "within a reasonable time prior to the commencement of trial." (*People v. Windham* (1977) 19 Cal.3d 121, 128, fn. 5 (*Windham*).) "Motions made just prior to the start of trial are not timely." (*People v. Scott* (2001) 91 Cal.App.4th 1197, 1205.) The court should draw every reasonable inference against waiver of the right to counsel. (*Brewer v. Williams* (1977) 430 U.S. 387, 391.) "In determining on appeal whether the defendant invoked the right to self-representation, we examine the entire record de novo." (*People v. Dent* (2003) 30 Cal.4th 213, 218.)

7

Appellant's *Faretta* motion was untimely because it was made on the eve of trial. (See *People v. Clark* (1992) 3 Cal.4th 41, 99 [*Faretta* request made during 10-day trailing period was, in effect, made on the eve of trial and, therefore, was untimely].) Appellant concedes his April 27, 2011 *Faretta* request "was made a week before trial" but he argues "the case had not suffered from unusual delay." That is not the law in California. There is no hard and fast rule that a motion made before commencement of trial—no matter how soon before—is deemed timely. (See *People v. Wilks* (1978) 21 Cal.3d 460, 467-468; *People v. Burton* (1989) 48 Cal.3d 843, 853-854.) The "reasonable time" requirement is intended to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice. (*People v. Burton, supra,* 48 Cal.3d at p. 852.)

When a *Faretta* motion is found to be untimely, the trial court may, in its discretion, grant or deny it after inquiring into such matters as "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham, supra,* 19 Cal.3d at p. 128.)

Having reviewed the record, we conclude the trial court did not abuse its discretion in denying appellant's request for self-representation. Appellant's experienced appointed attorney was prepared to begin trial.[3] At the *Marsden* hearing approximately one month earlier, appellant's counsel had outlined the case strategy which included establishing an alibi defense and appellant expressed no desire to file any motions. Appellant appeared on April 27, 2011, the date set for trial, and after expressing a desire for self-representation was told he could represent himself only if he was prepared to proceed with trial as scheduled on May 4th, 2011. Appellant understood he would have to present any motions on that date and responded "that's cool." However, when

---

[3]    Trial in appellant's case was originally set for April 27, 2011 but was trailed to May 4, 2011, only because appellant's counsel was engaged in another trial.

8

appellant returned after a short recess he requested a continuance to file "motions and whatnot." Although a review of the *Windham* factors convinces us that the court did not abuse its discretion in denying the motion, we also are convinced that appellant's *Faretta* motion was equivocal, an independent basis for us to uphold the court's exercise of discretion.

In *People v. Marshall* (1997) 15 Cal.4th 1, the court explained that circumstances apart from the defendant's own words may be indicative of an equivocal and therefore invalid *Faretta* request: "The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words. Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion. A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied." (*People v. Marshall*, *supra*, at p. 23.)

On March 22, 2011, the date originally set for trial, appellant first expressed a desire for self-representation. At that time, appellant's counsel had handled the case for approximately six months. The trial court was legitimately concerned that appellant might not want to really represent himself and gave appellant an opportunity to pursue a *Marsden* hearing. The trial court's instinct was correct as appellant spent more time complaining about how counsel was handling his case than he did asking for self-representation and ultimately chose not to represent himself. On April 27, 2011, the date set for trial to begin, appellant again expressed a desire for self-representation. When the court asked appellant if he was certain he wanted to make the prosecution's job easier to convict by foregoing counsel, appellant responded, "Well, it really don't matter." Appellant also remarked that he wanted to be "vindicated" because he was "a man." On both occasions appellant waited until the day of trial to assert his *Faretta* right. He did not believe his actions would make a difference and he did not show any indication that

he could competently represent himself at trial. A reasonable reading of this record is that appellant's desire for self-representation was motivated by his frustration and an intent to delay proceedings. Considering all of the circumstances, appellant's motion was properly denied.

## II. Substantial Evidence Supported Appellant's Kidnapping for Robbery Convictions

### A. *Contention*

Appellant contends the evidence was insufficient to support the kidnapping for robbery convictions. He contends "there was not substantial evidence that movement of the victims increased the risk of harm to the victims."

### B. *Standard of review*

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Hovarter* (2008) 44 Cal.4th 983, 996-997.) We resolve all conflicts in the evidence and questions of credibility in favor of the verdict, and indulge every reasonable inference the jury could draw from the evidence. (*People v. Autry* (1995) 37 Cal.App.4th 351, 358.) This standard applies whether direct or circumstantial evidence is involved. (*People v. Catlin* (2001) 26 Cal.4th 81, 139.)

### C. *Kidnapping for robbery-asportation requirement*

"Any person who kidnaps or carries away any individual to commit robbery" is guilty of kidnapping for robbery. (§ 209, subd. (b)(1).) Subdivision (b) of section 209 only applies "if the movement of the victim is [1] beyond that merely incidental to the commission of, and [2] increases the risk of harm to the victim over and above that necessarily present in, the intended" robbery. (§ 209, subd. (b)(2); *People v. Rayford* (1994) 9 Cal.4th 1, 12 (*Rayford*).)

10

"The rationale for [the asportation] requirement is that, given 'the breadth of the statutory definition of kidnapping, . . . it "could literally overrun several other crimes, notably robbery and rape, . . . since detention and sometimes confinement, against the will of the victim, frequently accompany these crimes. . . . It is a common occurrence in robbery, for example, that the victim be confined briefly at gunpoint or bound and detained, or moved into and left in another room or place.'" [Citations.] Our Supreme Court concluded that 'such incidental movements are not of the scope intended by the Legislature in prescribing the asportation element of the same crime.'" (*People v. Power* (2008) 159 Cal.App.4th 126, 137-138.)

With regard to the first prong of the asportation requirement, that the movement must be more than merely incidental to the robbery, the jury must consider the ""'scope and nature'""" of the movement, including the distance a victim is moved. The question is whether there was any gratuitous movement of the victims above that necessary to assist the robbers in obtaining the property. (See *People v. Washington* (2005) 127 Cal.App.4th 290, 299, 301.) There is no minimum distance a defendant must move a victim to satisfy the first prong. (*People v. Vines* (2011) 51 Cal.4th 830, 870 (*Vines*); *Rayford, supra,* 9 Cal.4th at p. 12.) The kidnapping statute does not speak of movement over any specified distance, and limiting a jury's consideration to a particular distance is "rigid and arbitrary, and ultimately unworkable." (*People v. Martinez* (1999) 20 Cal.4th 225, 236 (*Martinez*).)

We also consider the "context of the environment in which the movement occurred." (*Rayford, supra,* 9 Cal.4th at p. 12.) "This standard suggests a multifaceted, qualitative evaluation rather than a simple quantitative assessment." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152.) Whether movement was incidental is necessarily connected to whether it substantially increases the risk of harm. (*Ibid.*) "[A] movement unnecessary to a robbery is not incidental to it at all." (*People v. James* (2007) 148 Cal.App.4th 446, 455, fn. 6; see *People v. Corcoran* (2006) 143 Cal.App.4th

11

272, 279-280.) "Lack of necessity is a sufficient basis to conclude a movement is not merely incidental." (*People v. James, supra,* at p. 455.)

The second prong of the kidnapping requirement, increased risk of harm to the victim, requires the jury to consider factors such as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. (*Martinez, supra,* 20 Cal.4th at p. 233.) That these dangers do not in fact occur does not mean that the risk of harm was not increased. (*Rayford, supra,* 9 Cal.4th at p. 14.) While in most cases the increased risk of harm is a risk of physical harm, this requirement can also be satisfied by a risk of mental, emotional, or psychological harm. (*People v. Leavel* (2012) 203 Cal.App.4th 823, 833-834; *People v. Nguyen* (2000) 22 Cal.4th 872, 885-886.)

### D.      *Movements of victims increased harm and was not incidental*

In this case, there was substantial evidence that the movements of the robbery victims were not solely incidental to the robberies and substantially increased their risk of both physical and emotional harm. The movements went far beyond that which was necessary to accomplish the robberies.

The victims were moved a substantial distance; in the four incidents in which appellant was charged with kidnapping for robbery,[4] the victims were all moved to the back of the Check'N Go stores. As previously stated, there is no minimum number of feet that a robbery victim must be moved to satisfy the asportation requirement. (*Vines, supra,* 51 Cal.4th at p. 870.) Movement of as little as nine feet has been found to be a substantial distance. (*People v. Shadden* (2001) 93 Cal.App.4th 164, 169.) Whether a particular distance is substantial is not based solely on the number of inches and feet that the victim is moved, but on an overall evaluation of the "context of the environment in which the movement occurred." (*Rayford, supra,* 9 Cal.4th at p. 12.)

---

[4]      Sun Valley, La Puente, Covina, and Pomona.

The movement here, which was substantial in terms of distance, was not needed to facilitate the robberies, but instead changed the victims' environment and increased their risk of harm. The victims were moved by force from the front of the stores, which was visible from the store entrance, to closed-off areas at the back of the stores, and in three of the four incidents ultimately locked in a bathroom. As a result, the victims were isolated in a place where they could not be seen increasing their risk of physical harm. Moving the victims to an isolated area, and restraining them also increased the risk of psychological or emotional trauma.

The victim of the Pomona robbery was taken to the back of the store and handcuffed to her desk, likely to cause her greater emotional trauma and fear, not knowing how she could escape her restraints. The victims of the Sun Valley robbery were further isolated as they had their cell phones taken and were unable to communicate with anyone outside. After being taken to the back of the stores, the six victims of the Sun Valley, La Puente, and Covina robberies were all forced into bathrooms. They were already in a secluded area of the store and the forcible movement into the bathroom was gratuitous.

Appellant's reliance on *People v. Hoard* (2002) 103 Cal.App.4th 599 is misplaced. There, the defendant committed robbery by forcing two jewelry store employees to move about 50 feet to the office at the back of the store. The court reasoned: "Confining the women in the back office gave defendant free access to the jewelry and allowed him to conceal the robbery from any entering customers who might have thwarted him. Defendant's movement of the two women served only to facilitate the crime with no other apparent purpose." (*Id.* at p. 607, fn. omitted.) Here, the victims opened the safes and cash drawers when ordered to do so by appellant and Utley and were then moved to the back of the stores. As we have noted, the movement of the victims did not serve to facilitate the robberies, and in one case was an actual hindrance to the robbery. In the Sun Valley robbery, one of the victims was placed in the bathroom, then retrieved to open a cash drawer before being returned to the bathroom once more. The movements of

13

the victims here served other purposes squarely recognized by the Supreme Court in *People v. Dominguez, supra,* 39 Cal.4th 1141, as supporting a finding of a substantial increase in danger: removing the victims from public view, decreasing the odds that the robberies of cash from the Check 'N Go stores would be detected, increasing the risk of harm should any victim attempt to flee, and facilitating the robbers' escape. Indeed, there was no purpose for moving the victims to the back of the store and in all but one case into the bathrooms, except to facilitate these aims. In context, the movement was not merely brief and trivial; to the contrary, it substantially increased the risk of harm beyond that inherent in the crime of attempted robbery.

Considering the totality of the circumstances, there was substantial evidence to support the kidnapping for robbery convictions.

## III. Appellant's Ineffective Assistance of Counsel Claim is Meritless

### A. Contention

Appellant contends his trial counsel was constitutionally ineffective because he failed to investigate whether the object described by witnesses as a "gun" and observed on a surveillance video obtained from the La Puente robbery was in fact not a firearm. Appellant argues there was a "reasonable probability that the jury would have acquitted [him] of the felon-in-possession charges and found not true the firearm allegations."[5]

### B. Standard of review

To succeed on an ineffective assistance of counsel claim, a criminal defendant must show both that trial counsel's representation fell below an objective standard of reasonableness and that it is reasonably probable that the result of the proceeding would have been different if counsel's error had not occurred. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-688, 694-695 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 215-218; see *People v. Benavides* (2005) 35 Cal.4th 69, 92-93.) Appellant must establish

---

[5] Appellant does not contend that his convictions for eight counts of second degree robbery and seven counts of kidnapping for robbery, or enhancements for prior convictions, resulted from ineffective assistance of counsel.

ineffective assistance of counsel by a preponderance of evidence. (*People v. Ledesma, supra,* at p. 218.)

An ineffective assistance of counsel claim fails on an insufficient showing of either incompetency or prejudice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.) On the first prong of the ineffective assistance of counsel test, our scrutiny of defense counsel's performance must be highly deferential. We presume that defense counsel's conduct falls within a wide range of reasonable representation. (*Strickland, supra,* 466 U.S. at p. 689.) In reviewing ineffective assistance of counsel claims, appellate courts do not generally second-guess counsel's tactical decisions. (*People v. Hinton* (2006) 37 Cal.4th 839, 876; *People v. Holt* (1997) 15 Cal.4th 619, 703.) Where the issue is raised in a motion for new trial, we defer to the trial court's finding that appellant received adequate representation. (*People v. Andrade* (2000) 79 Cal.App.4th 651, 660.)

The second prong—prejudice—is established if counsel's failings render the jury's verdict unreliable or the trial fundamentally unfair. Counsel's failings must have undermined the proper functioning of the adversarial process that we cannot rely on the trial as having produced a just result. (*Strickland, supra,* 466 U.S. at p. 686; *In re Cudjo* (1999) 20 Cal.4th 673, 687.) The failure must be such that it undermines our confidence in the outcome of the trial. (*People v. Majors* (1998) 18 Cal.4th 385, 403.) The deficiency must be egregious. (*People v. Hart* (1999) 20 Cal.4th 546, 633.)

### C. Background

After the jury returned a verdict and before appellant's trial on his prior convictions, the trial court granted appellant's motion to represent himself. Appellant hired a video and firearms expert, Dr. Bruce Krell, to examine the surveillance tape from the La Puente robbery. Based on Krell's conclusion that the gun in the surveillance video looked like a pellet gun and not a firearm, appellant argued in his new trial motion that his defense counsel was ineffective because he had not retained a firearms expert. Defense counsel testified at the hearing on the motion for new trial. He testified that he did not consult a firearms expert because even if he had obtained evidence that the gun

15

was not a firearm he would be required to argue inconsistent theories—appellant did not commit the robberies but if he did, the gun he used was not real. In his experience, arguing alternative theories always resulted in losing both. The trial court concluded that defense counsel had provided "an adequate, professional and appropriate explanation" for his decision not to consult with a firearms expert. Given defense counsel's experience and the defense theory of misidentification, the trial court found that defense counsel made a reasonable tactical decision not to argue in the alternative stating, "it was a reasonable tactical decision for [defense counsel] to focus on the I.D. issue and to try to convince the jury that [appellant] [was] not there as opposed to going—as opposed to arguing either in the alternative or even in place of that, 'Look, the gun allegations weren't proved' . . . or other legal issues that might eliminate . . . either certain charges or certain allegations or reduce them somewhat."

### D.    Analysis

Appellant did not satisfy either prong of a claim of ineffective assistance of counsel. Appellant insisted he had no involvement in any of the robberies and insisted he should be found not guilty of all charges thereby eliminating any possibility that his counsel could negotiate a plea agreement that could reduce appellant's overall exposure. Defense counsel made it clear during a pretrial *Marsden* hearing and during the hearing on the motion for a new trial that the prosecution theory was that all the crimes were committed by the same two people. Counsel's strategy was to present a case of mistaken identification because if appellant could present an alibi to some counts he could not have committed all of them. That strategy was the only means by which appellant could have been acquitted on all counts and all special allegations. Appellant did not object at the March 22, 2011 *Marsden* hearing when defense counsel informed appellant of that strategy and in fact supplied defense counsel with more information on alleged alibis for the crimes.[6]

---

[6]    Appellant did not contradict defense counsel's testimony that appellant was in agreement with the strategy of misidentification in an attempt to win outright acquittal.

Testimony by Krell, if believed, that the "gun" used in the La Puente robbery was not a real gun would have been of little assistance to appellant's claim that he was "not guilty of all charges." The evidence showed that in some robberies both robbers had guns, while in other robberies only one robber had a gun. Alma Sandoval testified that the gun appellant pointed at her during the Covina robbery was black and small and looked like a nine-millimeter automatic pistol. Krell described the "gun" from the La Puente robbery as "large" and he did not compare the image of the gun to any nine-millimeter semiautomatic firearms. Krell's testimony, if believed, was of limited benefit and would have had no application to any of the other robberies. Had defense counsel presented such evidence he would have been forced to argue in the alternative—appellant should be acquitted of the robbery and kidnapping at the La Puente store, but if convicted he should be acquitted of using a firearm. The record disclosed defense counsel employed a coherent defense strategy throughout trial, attacking the identification of appellant by the eyewitnesses. Defense counsel's strategic decision to not present a firearms expert was the only way to secure an acquittal on all charges. Lack of success does not reflect incompetence of counsel.

Appellant's claim that defense counsel actually did argue alternative theories to the jury and did not "pursue solely a strategy that [appellant] was not one of the robbers" is incorrect. Defense counsel's questions regarding details of what the victims observed regarding the guns during the robberies challenged the victims' recollection skills and supplemented defense counsel's misidentification strategy. Counsel also used that evidence to make a motion to dismiss pursuant to section 1118.1, outside the presence of the jury, at the end of trial.

Nor can appellant show prejudice in this case. Although appellant now argues on appeal that a firearms expert may have assisted in the defense of "four counts of felon in possession of a firearm, and several allegations that either [appellant] or a principal used a firearm during the robberies" his stated goal until filing a motion for new trial was total acquittal. Because appellant was an "eight striker" with three prior prison terms, a single

felony conviction would have exposed him to a 40-year-to-life sentence.  Appellant was sentenced to hundreds of years to life in prison and all of Krell's testimony related to a *single* enhancement of a *single* count which amounted to a 10-year portion of that sentence.  If appellant had been sentenced for only the robbery convictions and prior felony enhancements, that is, no kidnapping counts or firearms enhancements, his sentence still would have been hundreds of years to life in prison.

As the United States Supreme Court has instructed:  "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (*Strickland, supra,* 466 U.S. at pp. 690-691.)

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. *

                         FERNS


We concur:


_____, P. J.

              BOREN


_____, J.

            CHAVEZ

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19